<pre>
 1                     UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    WESTERN DIVISION - LOS ANGELES

 3

 4   UNITED STATES OF AMERICA,   )   Case No. 25-MJ-993
                                 )
 5        Plaintiff,             )   Los Angeles, California
                                 )   Tuesday, March 11, 2025
 6             v.                )   3:05 P.M. to 3:50 P.M.
                                 )
 7   MAKSIM ZAITSEV,             )
                                 )
 8        Defendant.             )
     _____     )
 9

10

11

12                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JACQUELINE CHOOLJIAN
13                 UNITED STATES MAGISTRATE JUDGE

14

15   Appearances:                See Page 2

16   Deputy Clerk:               Kerri Hays

17   Court Reporter:             Recorded; CourtSmart

18   Transcription Service:      JAMS Certified Transcription
                                 16000 Ventura Boulevard #1010
19                               Encino, California  91436
                                 (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>

1    APPEARANCES:

2

3    For the Plaintiff:        United States Attorney's Office
                               Central District of California
4                              By:  JOSEPH S. GUZMAN
                               312 North Spring Street, 12th Floor
5                              Los Angeles, California  90012
                               (213) 894-2438
6                              joseph.guzman@usdoj.gov

7

     For the Defendant:        Federal Public Defender's Office
8                              Central District of California
                               By:  SHANNON M. COIT
9                              321 East Second Street
                               Los Angeles, California  90012-4206
10                             (213) 894-2854
                               shannon_coit@fd.org
11

12   Also Present:             VLADIMIR FERKELMAN
                               Russian Language Interpreter
13

14

15

16

17

18

19

20

21

22

23

24

25

 1   LOS ANGELES, CALIFORNIA, TUESDAY, MARCH 11, 2025, 3:05 P.M.

 2        (Call to Order of the Court.)

 3            THE CLERK:  Calling Case No. 25-mj-993,

 4   *United States of America v. Maksim Zaitsev.*

 5            Counsel, please state your appearances.

 6            JOSEPH S. GUZMAN:  Good afternoon, Your Honor.

 7   Joseph Guzman on behalf of the United States.

 8            THE COURT:  Good afternoon.

 9            SHANNON M. COIT:  Good afternoon, Your Honor.

10   Shannon Coit from the Federal Public Defender's Office on

11   behalf of Maksim Zaitsev.

12            And as an initial matter, can I request that his

13   wrist shackles be removed for the hearing?

14            THE COURT:  Just one second.

15            Can the interpreter state his name for the record.

16            THE INTERPRETER:  Vladimir Ferkelman, F-e-r-k-e-l-

17   m-a-n.

18            THE COURT:  And translating language?

19            THE INTERPRETER:  Russian.

20            THE COURT:  Thank you

21            And Pretrial?

22            FATIMA VAZQUEZ:  Good afternoon, Your Honor.

23   Fatima Vazquez with Probation and Pretrial Services.

24            THE COURT:  All right.  Thank you.

25            Marshals, any reason we shouldn't unshackle him?

1          THE MARSHAL:  Deputy Cowens (phonetic), Your Honor.

2    We -- the Marshals personally do not recommend that we take

3    off the shackles (inaudible).

4          THE COURT:  Because of the nature of the

5    allegations?

6          THE MARSHAL:  Yes.

7          THE COURT:  All right.  Let me inquire.

8          Mr. Zaitsev, because of the nature of the

9    allegations -- you can sit down -- the marshals are concerned

10   about releasing your handcuffs.  I remember at the last

11   hearing, hearing about the context of what happened from your

12   counsel.  So let me ask you: If I ask the marshals to

13   unshackle you, are you going to behave yourself?  You're not

14   going to resist arresting?

15         THE DEFENDANT:  Of course not.

16         THE COURT:  Well, let me ask --

17         THE DEFENDANT:  Of course not.

18         THE COURT:  Let me ask this question separately.

19   Are you going to behave yourself?

20         THE DEFENDANT:  Yes of course.

21         THE COURT:  All right.  And you're not going --

22   you're just going to sit there quietly and not attempt to

23   injure anyone; is that correct?

24         (Pause.)

25         THE COURT:  You need to respond out loud.

1    THE DEFENDANT:  Yes of course.

2    THE COURT:  Okay.

3    Marshals, I appreciate the concern.  I don't know

4  if you were at the last hearing, but I heard all the context

5  of what happened.  So I'm comfortable unshackling him at this

6  time.  If you could do that, I would appreciate it.

7    Government, you wanted to weigh in on that?

8    MR. GUZMAN:  Your Honor, I was just going to put

9  something on the record as far as, in my experience here,

10  having sat through many of these hearings, this is, I think,

11  the first time the marshals have ever actually stood up and

12  asked to keep someone detained.  I know Your Honor is very

13  well familiar with that.  I think under the circumstances --

14  there's no prejudice, there's no jury, nobody is judging him

15  one way or the other for being shackled, and I would just

16  want to defer to the marshals' judgment in this case.

17    THE COURT:  I understand.

18    All right.  I -- please just unshackle him.  It'll

19  be a -- shouldn't be a long hearing.

20    And, Ms. Coit, are you comfortable with that?

21    MS. COIT:  Yes.

22    THE COURT: Okay.

23    All right.  Sir, again, the marshals are going to

24  be close by.  So you'd best not give us any cause to do

25  something different here.

1          (Defendant is unshackled.)

2          THE COURT:  All right.  This matter is on a for a

3     bail reconsideration.  Before I hear from counsel, let me

4     just recite the materials I have in front of me.  And again,

5     because we do have an interpreter, I'll remind everyone to

6     speak slowly to ensure that the interpreter is able to

7     translate properly for Mr. Zaitsev.

8          So the Court has the defense's application for the

9     hearing today; I have my prior order detaining the defendant;

10    I have a copy of the complaint -- the charging document --

11    and the supporting affidavit; and I have a copy of the

12    original and updated Pretrial Services Report.

13          Government, do you have all of those items?

14          MR. GUZMAN:  Yes, Your Honor.  And the Government

15    would proffer all of those, as well as both recommendations

16    of detention by Pretrial Services.

17          THE COURT:  All right.  Let me inquire: Has an

18    indictment been returned on this case yet?

19          MR. GUZMAN:  Yes, Your Honor.  The indictment was

20    returned on Friday of last week.

21          THE COURT:  All right.  And is that something that

22    the defense has a copy of?

23          MR. GUZMAN:  So I just showed defense counsel this

24    before the hearing, and I think it -- I believe it got on the

25    docket.  I just got a confirmed copy, I think, Monday

1   afternoon.

2         THE COURT:  All right.  You're not proffering it

3   up, though?

4         MR. GUZMAN:  I can proffer it.  The --

5         THE COURT:  Well, I don't have it.

6         MR. GUZMAN:  Yeah.

7         THE COURT:  That's what I'm saying.  If you -- if

8   it's something you wish to proffer, you need to supply the

9   Court with a copy.

10        MR. GUZMAN:  Thank you, Your Honor.  The Government

11  will proffer the indictment.

12        THE COURT:  Then you need to give me a copy.

13        MR. GUZMAN:  Okay.  Would you like me to email it

14  to your chambers?  I don't have a hard copy.

15        THE COURT:  Oh, you -- okay.  Well, I'm not going

16  to consider it at this time because I don't want to delay

17  proceedings further.

18        MR. GUZMAN:  Maybe I can -- I can proffer that he

19  has been indicted.  The indictment itself contains no

20  additional information that I intend to rely upon during this

21  argument, though.

22        THE COURT:  Okay.  All right.

23        Then let me ask the defense: Do you have all of the

24  items that I ticked off?

25        MS. COIT:  Yes, Your Honor.

1          THE COURT:  All right.  And any additional

2    documents or facts the defense would like to proffer at this

3    time?

4          MS. COIT:  A few facts, Your Honor.

5          Just referring to the administrative proceeding --

6    and I had raised this at the last hearing --

7          THE COURT:  Please slow down.

8          MS. COIT:  Relating to the administrative

9    proceeding that was initiated against Mr. Zaitsev in

10   December 2022 -- I had proffered this at the last hearing as

11   well, but it's my understanding that was a removal proceeding

12   against him which is now subject to a pending asylum

13   application and that the application is based on

14   Mr. Zaitsev's fear of returning back to Russia because of his

15   perceived support of an opposition party in which -- relates

16   to an incident where he was filming at a rally there and that

17   he does have hearings set in the asylum proceeding, and I

18   understand that they could be as early as next month, in

19   April.

20         As stated in the complaint, there was a G-56 letter

21   that was issued in this -- which is why Mr. Zaitsev had

22   reported to the ICE administrative offices, and that is --

23   Government counsel showed me a copy of it before.  It's just

24   a form letter stating to show up to the office to discuss the

25   case and to bring your documents with you, and what I'm

1  proffering is that the incident happened when Mr. Zaitsev had

2  reported in compliance with that letter and that he reported

3  with his partner, who he refers to as his "wife," of several

4  years.

5          I also want to proffer that the -- in the complaint

6  it discussed that Mr. Zaitsev was handcuffed, and when he was

7  handcuffed, it was behind his back.

8          And the arrest, from my understanding, was made in

9  accordance to an administrative arrest warrant that was

10 issued by the Department of Homeland Security.  I was able

11 review a copy of that before this hearing.  It does not state

12 any reason -- as -- additional crime or anything like that

13 being committed in the U.S. other than just it is the

14 determination of the agency that there is probable cause that

15 he could be removed.

16         And then, lastly, that there have been no

17 allegations or complaints that Mr. Zaitsev has any issues

18 with any of the guards or personnel at MDC during his stay

19 nor were there any -- from my understanding, any complaints

20 or issues with the marshals at the last hearing or for today.

21         THE COURT:  I'm sorry.  You're saying there were no

22 complaints?

23         MS. COIT:  Correct, Your Honor.

24         THE COURT:  Okay.

25         MS. COIT:  And that is all I have.

1          THE COURT:  All right.  Let me just inquire of the

2     marshals: Are you able to confirm what defense counsel said?

3     In other words, are you aware of any issues the marshals have

4     had with Mr. Zaitsev?

5          THE MARSHAL:  Your Honor, at this time I can't

6     confirm that.  I don't have any information in front of me --

7     any write-ups, anything in regards to the certified

8     (indecipherable).  We're just limited to our interactions

9     with him today, but this is our first time --

10          THE COURT:  Okay.  All right.  And can you just

11     state your name for the record.

12          THE MARSHAL:  (Indecipherable.)

13          THE COURT:  All right.  Thank you.  And again, your

14     prior request to leave him shackled -- that was based solely

15     on the charge; is that right?

16          THE MARSHAL:  Yes, Your Honor.

17          THE COURT:  Okay.  All right.

18          Government, you can -- well, actually, let me stay

19     with the defense.  It's your application.

20          Do you want to argue at this time?

21          MS. COIT:  Yes, Your Honor.  And I point to the

22     conditions -- so we're now able to propose additional

23     conditions for release, which would be unsecured bond that --

24     signed by Mr. Zaitsev's friend Grant Galustian (phonetic),

25     and I apologize if I'm mispronouncing that.

```
 1              THE COURT:  It's probably Galustian is my guess but
 2    --
 3              MS. COIT:  Galustian.  Yes.  Thank you, Your Honor.
 4              THE COURT:  Is he present in court?
 5              MS. COIT:  He is present in court, Your Honor.
 6              THE COURT:  All right.  Thank you.
 7              MS. COIT:  Pretrial Services spoke with
 8    Mr. Galustian earlier and he had stated he would do a 5,000
 9    bond.  I talked with him earlier -- or prior to the hearing.
10    He said, if needed, he would then do up to 10,000 if the
11    Court required.
12              We are also offering the same conditions offered
13    before as far as, you know, restriction on travel to the
14    Central District, surrender of any travel documents that have
15    not already been surrendered.  There's no reported use of
16    drugs or alcohol by Mr. Zaitsev, but if Your Honor wanted to
17    have any type of testing -- (indecipherable) that -- that is
18    something that the defense would be open to.  He could submit
19    to a mental health assessment and psychological counseling,
20    if needed, and essentially whatever else the Government -- or
21    whatever the Court needed, if that was location monitoring,
22    or what have you, but I'll, of course, make my argument about
23    flight now.
24              So I first want to start with just how detention
25    works.  I mean, in our society, as Chief Justice Rehnquist
```

1   stated in *Salerno*, that liberty is the norm and that

2   detention prior to trial is the carefully limited exception,

3   and I start with that because it's always the Government's

4   burden to establish, one, by clear-and-convincing evidence

5   that there is no set of conditions that can reasonably assure

6   safety to the community, and; two, it's by the preponderance

7   of evidence that there's no set of conditions to reasonably

8   assure Mr. Zaitsev's appearance in this case.

9         And so I first want to discuss that with the burden

10   in mind the danger to the community because, as shown in the

11   Pretrial Services Report, Mr. Zaitsev has no criminal history

12   since being in the U.S., which has been over two years.  He

13   doesn't have any arrests or a moving violation.  And he's

14   been in the U.S. because of his perceived support of the

15   opposition party there, not because he has a criminal history

16   back in Russia that he is trying to escape.  He is here

17   nothing related to violence.

18         And so this is key because the only thing that

19   indicates violence in this case are the allegations that are

20   against him, and those are allegations that still need to be

21   proven, and even if so, those allegations -- what they

22   demonstrate are -- is a one-off, unique situation that

23   occurred in a very extreme setting.  And so I want to walk

24   through exactly what the complaint said because that provides

25   the background for what happened in this case -- or at least

1  what the Government's version of events is.

2          And so it states in -- between paragraph 6 --

3  7 and 8 about how the G-56 letter was issued for Mr. Zaitsev

4  and then he reported to the ICE office.  In paragraph 9 it

5  says that Mr. Zaitsev was handcuffed, and as I proffered, he

6  was -- agents had handcuffed him behind his back.  There is

7  no mention in the complaint that there was any resistance or

8  fighting by Mr. Zaitsev.

9          In that cites how they attempted to escort

10  Mr. Zaitsev to processing, and in making this attempt, they

11  had started to be able to walk him through a hallway, and

12  it's at that point that he sees someone who the agents state

13  -- or believe is his wife, and they say that he became

14  agitated, but what they describe -- or what is described in

15  the complaint is that he screams toward that individual who

16  he -- who the agents believe was his wife, and that he

17  dropped weight.  So he wasn't punching.  He wasn't pulling

18  away.  He wasn't kicking or screaming at the officers or

19  anything like that.  He had screamed towards his wife, and he

20  dropped down.  So he did the opposite of trying to fight.  He

21  just stopped.

22          It's then -- the -- it states in the complaint that

23  Mr. Zaitsev and the agents, quote, "lost their balance and

24  fell to the ground."  Again, it does not say that Mr. Zaitsev

25  pushed the agents, that they fell as he tried to pull away --

1   anything like that.  It is that they lost the balance and

2   they fell.  If there was more, Your Honor, I believe that we

3   would see that in the complaint.  And it's only when the

4   agents, quote, "attempted to regain control" of Mr. Zaitsev

5   -- this is all in paragraph 9 -- that he allegedly bit one of

6   the agents.

7          So there's two points that I want to make here.

8   First is what I've already said.  Even if all of these facts

9   are true, what they amount to is a very unique circumstance

10  where Mr. Zaitsev is handcuffed, and it happens only after he

11  has seen his wife and fall -- screams towards her and then,

12  again, fell to the ground.  He is not initially -- he didn't

13  initially resist when he was handcuffed.  He was, from all

14  that we know from this complaint, compliant with that.  And

15  when he hits the first stimulus -- stimuli to seeing his

16  wife, he also doesn't fight at that point.  He stops and

17  drops weight.  It is only, again, during what is regaining

18  control that there's alleged that a bite happens.

19         So this is describing a very isolated incident that

20  isn't -- and there's no reason to believe that this situation

21  would be replicated and that Mr. Zaitsev therefore is a

22  danger to the community for this reason, and that's -- like I

23  said, underscored in the last four -- few weeks, where

24  Mr. Zaitsev has been interacting with MDC guards and

25  personnel every single day, and we have no reported incidents

1    from MDC, and as I said, I believe we would know if there was

2    anything that happened with the marshals as well, and we

3    didn't -- from my observations, didn't observe any issues at

4    the last hearing nor have I observed anything today.

5          And the second part that I want to get to with

6    emphasizing the complaint is that the facts -- is because

7    under the Bail Reform Act, the weight of the evidence is the

8    least amount of factor that should be considered by the

9    Court.  I understand that these allegations are being used in

10   dual ways here, but looking at these facts as alleged, they

11   don't add up to a conviction for Mr. Zaitsev of the crime

12   that he's been charged with.  And there's good reason to

13   believe that the weight of the evidence is going to turn out

14   in Mr. Zaitsev's favor, and that's because the complaint

15   establishes that Mr. Zaitsev is handcuffed at this time, and

16   like I said, it's behind his back, and he is with two agents.

17         The glaring question here is how did the agent's

18   finger get inside Mr. Zaitsev's mouth?  Clearly, there are

19   missing facts here, and if those facts were in favor of the

20   Government, I believe that we would see them in the

21   complaint, but we don't.  And so there is reason to believe

22   that those facts are in favor of the defense and that as

23   being alleged is not what it is.

24         And I think we also can cite to the language that's

25   being used here, that Mr. Zaitsev is agitated, but all he's

1    doing is dropping weight, that the agents and he lose their

2    balance, and that they fell, and that they're -- attempted to

3    gain control.  So I think those are key points to

4    understanding what circumstance is the Government trying to

5    say they have established their burden by clear-and-

6    convincing evidence?  And again, there -- and its clear-and-

7    convincing evidence that there's no conditions that can be

8    placed on Mr. Zaitsev to guarantee his safety here.

9            And so moving on to flight, as to flight,

10   Mr. Zaitsev has shown that what he -- he will do if he is

11   ordered by this Court to appear somewhere.  He will show up.

12   That's exactly why we -- he is here in this situation is

13   because he received a letter from the Government agency to

14   voluntarily arrive at an office at a certain date and time,

15   and he did exactly that.

16           He's also not going to flee to another country.  He

17   came to the U.S. for a reason, and he does not have a country

18   to go back to.  He also has spent the last two years building

19   his life.  He has been working, he has gotten an apartment

20   with his partner, and he is not going to risk all of that

21   here, whereas I've already laid out we do have -- there is

22   going to -- there are defenses in this case.  He's not going

23   to risk missing his chance in court to defend and present his

24   side of this case.  It's also that he has a pending asylum

25   application currently going.  He, again, is not going to

1   jeopardize that application for missing -- for not appearing

2   in this case.

3           In short, Your Honor, the Government cannot show

4   it's more likely not that Mr. Zaitsev is a risk of flight.

5   He wants to be in this country, he wants to see this court

6   system work, and he is going to appear in this case if

7   released.

8           That is all I have, Your Honor.

9           THE COURT:  All right.  Thank you, Counsel.

10          Government?

11          MR. GUZMAN:  Thank you, Your Honor.

12          And let me start with the risk of flight issues

13  since that's where defense counsel ended up.  So as noted in

14  the Pretrial Recommendation and Report, Pretrial has

15  concluded there are no conditions that would ensure that the

16  defendant appears as required.

17          THE COURT:  Let me actually get clarification on

18  that.

19          Pretrial, the original report recommended detention

20  based on danger and flight.  The updated report recited

21  danger and didn't really address flight.  So I wasn't sure

22  whether that was an oversight or whether Pretrial is

23  recommending detention based solely on danger at this point.

24          MS. VAZQUEZ:  That's correct, Your Honor.  We

25  apologize.  That was an oversight where -- we continue to

1    recommend based on nonappearance and danger.

2             THE COURT:  Okay.  Thank you for that

3    clarification.

4             MS. VAZQUEZ:  Thank you.

5             THE COURT:  Sorry, Government.  Go ahead.

6             MR. GUZMAN:  Sure.  And to cut right to the chase

7    on that, the only difference today versus before is that

8    there's a 10,000 -- a $5,000 surety proposed by --

9             THE COURT:  10,000.

10            MR. GUZMAN:  According to the Pretrial Services

11   Report --

12            THE COURT:  Right.

13            MR. GUZMAN:  -- it's 5,000.

14            THE COURT:  And Ms. Coit indicated that she spoke

15   with the surety and he was willing to go up to 10,000, so.

16            MR. GUZMAN:  Fair enough.

17            And so that surety, of course, is unsecured.  It is

18   offered by an individual who apparently makes $20- to $30,000

19   a year.  It is offered by an individual who could not verify

20   basic biographical information about the defendant, including

21   his date of birth, his residence, how long he's been in

22   Central District of California, where he was before, his

23   frequency and contacts with his family, his education, his

24   military history, his employment, his financial information

25   --

```
 1                THE COURT:  Slow down a little.

 2                MR. GUZMAN:  -- his history of substance abuse.

 3   Those are all pieces of information that the surety could not

 4   verify.

 5                I'll also note that given that this surety is

 6   making $240,000 to $360,000 a year, a $10,000 bond is not

 7   significant, and again, it's unsecured.

 8                THE COURT:  I'm sorry.  I thought you said he was

 9   making 20- to 30,000 a year?

10                MR. GUZMAN:  $20- to $30,000 a month.

11                THE COURT:  A month.

12                MR. GUZMAN:  Take that out to a year.  It's

13   $240,000 to $360,000 a year.

14                THE COURT:  Okay.

15                MR. GUZMAN:  And I understand that the surety has

16   now come in and said $10,000.  As a I read the Pretrial

17   Services Report, defense counsel initially told Pretrial that

18   he would offering $10,000.  After being explained what a

19   surety is required to do, he came down to $5,000.  I don't

20   know what happened as far as -- between his conversations

21   with Pretrial and now, but clearly it has shifted a little

22   bit.

23                THE COURT:  All right.

24                MR. GUZMAN:  Finally, I'll note that the surety has

25   some inconsistent information.  For example, the surety had
```

1    said that the defendant had two siblings in Russia.  The

2    defendant has a single sibling.  According to himself in the

3    original Pretrial Report, he has one sibling in Russia.  And

4    then the surety states the defendant worked fulltime at

5    South Coast Toyota.  Now, I don't know if this is a full

6    inconsistency, but that was not stated in the original

7    Pretrial Services Report.  According to the defendant in the

8    original Pretrial Services Report, he stated that he conducts

9    mechanic work, drives for Uber, and rents vehicles on Toro.

10         But when it comes to whether this -- there is a

11   condition that would be sufficient to ensure that this

12   defendant appears, I do not believe that the surety really

13   changes the game here.

14         And let me talk about some factors about risk of

15   nonappearance.  Obviously, there are significant ties between

16   this defendant and not to this district.  The defendant is a

17   Russian citizen.  Both of his parents reside in Russia.  He

18   has a sibling in Russia.  He maintains daily contact with his

19   mother in Russia.  He also appeared to have lived in Maryland

20   during his time while in the United States.

21         And with respect to foreign travel -- this was not

22   stated in the original Pretrial Report, but according to the

23   surety, the defendant has in fact traveled to Mexico, as

24   reported in the new Pretrial Report.  It's particularly

25   concerning because apparently the defendant was unable to

1    find his passport, which is also reported in the Pretrial

2    Report.  Now, an individual who is facing potential removal

3    hearings and an application for asylum ought to be able to

4    have their passport.

5           I'll also note that there are a lack of community

6    ties in this district.  Obviously, there's the surety now.  I

7    understand that his wife was residing with him here, but

8    there is nobody else that we are aware of and he did not

9    identify any other ties to this district.  It's also entirely

10   unclear how long he's been living in the district.

11          I'll get to the nature of the offense when we talk

12   about risk of danger, but just to put this out there for now

13   with regards to risk of nonappearance, the defendant was

14   under a lawful order to be detained.  He was being walked to

15   his -- be processed, and he disobeyed lawful orders to

16   continue to walk.  He obviously disobeyed an implicit lawful

17   order not to bite the officer's fingers.  So it's clear that

18   the defendant has some challenges listening to lawful orders.

19          And the last point I'll make is there's a lot of

20   information that's not been verified in this case,

21   Your Honor.  In the original Pretrial Report, the following

22   information was not verified: his history and family ties;

23   his residence; his education; his marital status; his

24   citizenship and foreign travel, including the fact that he

25   did not disclose that he had traveled to Mexico, but

```
 1    apparently the surety did state that; his employment history;
 2    his financial health; his regular -- and his physical health.
 3    And I'll note that some of those pieces of information
 4    defense counsel and the defendant opted not to include, and
 5    so he was instructed not to provide certain amounts of this
 6    information, including his place of birth.
 7              (Pause.)
 8              MR. GUZMAN:  Excuse me, Your Honor.
 9              (Pause.)
10              MR. GUZMAN:  Going to the risk of danger to the
11    community -- and I'll start by saying, Your Honor, I
12    understand that the complaint is all that has been proffered
13    at this point, and if this Court has specific questions about
14    the overall investigation and what actually we've revealed,
15    I'm happy to answer that and proffer those facts.  I'll note
16    that defense counsel proffered some facts that have not been
17    verified, have not -- there's no document that she proffered.
18    I'm happy to discuss the -- what the investigation has
19    revealed, but contrary to what defense counsel said, what is
20    in the complaint is not all that we have learned, and that is
21    a common practice.  A complaint is obviously drafted quickly.
22    We have a 48-hour window.  We do not include every single
23    piece of information, and we continue to investigate past the
24    filing of the complaint.
25              If Your Honor is interested to hear it and is
```

1   willing to allow me to proffer those facts, I will do so, but

2   for now I can just say it is a lot more to that particular

3   incident than how defense counsel described it.  The

4   defendant was not cooperative.  The defendant did kick.  The

5   defendant did -- dropped his weight.  The defendant kicked

6   his feet off of the ground.  The defendant screamed.

7          And ultimately, of course, as we know, and we saw

8   the pictures -- and I understand Your Honor saw the pictures

9   -- the defendant bit an officer's finger, and it wasn't just

10  a bite and let it loose.  It wasn't an accident.  He held

11  onto it.  The officer that was being bit, screamed, "He has

12  my finger in his mouth."  There was a period of time where he

13  had the finger in his mouth, and you saw the pictures.  It

14  broke skin and caused blood.  There's a medical report from

15  the officer that shows he had to go to the hospital to get

16  treated, he had X rays, his finger was fractured, he was

17  treated for a human bite, and he was prescribed pain

18  medication as well as medication to fight off any possible

19  infections.

20         And whether this is an isolated incident or not,

21  the point is that this defendant is obviously emotional when

22  he interacts with law enforcement, he's emotional here today,

23  and I think there's a very real concern about this

24  defendant's ability to operate under any terms in a safe

25  manner.

1    With that, Your Honor, if you have any other

2 questions, I'm happy to address them.

3    THE COURT:  All right.  Thank you.

4    I'll allow the defense to respond, and then I'll be

5 coming to Pretrial just asking if anything you've heard

6 alters your recommendation and if there's anything else you

7 want to add.

8    All right.  Ms. Coit?

9    MS. COIT:  Thank you, Your Honor.

10    Yes, starting first with flight, as far as the

11 surety, he is here in this room.  I mean, we're talking about

12 what does it take to have someone come and show up for a

13 friend, to say that he's -- basically I believe is -- the

14 inference is that he doesn't know Mr. Zaitsev, that he's not

15 well tied to him, that he doesn't know his background, but I

16 just -- I can tell you from personal experience, having

17 talked to him myself -- or someone in my office -- multiple

18 times within the last two weeks and, again, his appearance

19 here today and his willingness to talk with Pretrial

20 (inaudible) just go to show that he is someone who

21 Mr. Zaitsev trusts and who -- it is going to pain Mr. Zaitsev

22 if he did not show up and caused his surety to owe the money

23 that he's putting up.

24    If Your Honor requires more than $10,000, then that

25 can be a condition that's placed for release.  Just because

1  -- and then it can be for a responsible third party, and then

2  the defense can later on identify who that is.  We don't --

3  there's not necessarily a need to have it for today.  We have

4  one, and I presented the amount that we can for right now,

5  but if Your Honor believes that more money is needed for

6  Mr. Zaitsev's appearance in this case, the Court can order

7  it.

8            The standard for detention is that there is no

9  condition suitable to reasonably assure -- again, it doesn't

10  have to be to guarantee -- to reasonably assure that

11  Mr. Zaitsev will appear in this case, and so I just want to

12  remind that if we need to make adjustments to what the

13  conditions are, that can be done.  If it needs to be location

14  monitoring, if there's need to be home detention, that is --

15  we are -- defense is open to that, whatever conditions need

16  to -- are needed to satisfy, again, that standard of

17  reasonably assuring that he appears in the case.

18            And I want to say that it's frequent that sureties

19  can't verify all of the background for an individual.  I've

20  had that happen in cases.  But he did verify a lot of

21  information.  Like I've said here -- that it says here, he

22  did -- couldn't do specific employment but did verify that he

23  -- that the defendant had worked at DoorDash and Uber, which

24  is what the -- what Mr. Zaitsev had told Pretrial; talks

25  about that he doesn't have any children; that he was born in

1  Russia; he's aware that there's no legal status in the U.S.;

2  that he arrived two years ago; that he has a passport, and

3  what have you.  And again, just being here today, I think,

4  says more so than, you know, knowing the exact birthday of

5  one of your friends, which I, you know, have to admit, I

6  don't always know the birthdays of my friends, to be honest.

7          And as far as the confusion with South Coast

8  Toyota, I don't know -- that wasn't for Mr. Zaitsev's

9  employment.  That was for the surety's employment.  That is

10  where he works.

11          And then, you know, discussing about his ties to a

12  foreign Government, I believe I've already addressed that.

13  Mr. Zaitsev cannot go back to Russia.  He is not going to

14  voluntarily do that under any circumstance.  He is here in

15  the U.S. because he is trying to get away from that country,

16  and he is going to through the asylum process in the U.S. so

17  he can stay here.  There is -- this case is not going to be

18  what makes him flee the country, just is not going to be what

19  happens.  And he has established, as reflected in the

20  Pretrial Report, a life in Southern California, and he has

21  just recently gotten an apartment with he and his partner,

22  has been working, again, has a friend close enough to come to

23  court on less than 24 hours' notice, and so I think those go

24  into favor of Mr. Zaitsev staying here.

25          And as to the not following orders, I don't see

1    anywhere in the complaint where it was ordered that he had to

2    continue walking and he dropped instead.  Again, I would just

3    point to the fact that he did show up.  It doesn't seem to

4    say anything that -- you know, that he was able to be

5    handcuffed without issue and the other arguments that I made

6    earlier.

7              And then going to the Government's argument as far

8    as the allegations in this case and to danger, again, what

9    they're relying solely on is this incident.  This isolated

10   incident is all that the Government is citing to, and what we

11   have is the complaint.  And I agree this is not all of the

12   information, but the Government also still hasn't explained

13   how did a finger get into Mr. Zaitsev's mouth based on what

14   is here.  There may have been kicking.  I -- from what it

15   says, we don't know when that occurred.

16             And again, I think that, if there was more in

17   support of the Government's argument, we would have seen it

18   here.  The language would have been different.  It would have

19   said much more about aggressive moves, that he was punching

20   and hitting -- or whatever it may be -- but that's not what's

21   included.  This is what we have, and this is not clear-and-

22   convincing evidence that the Government is required to do to

23   say that there are no conditions to guarantee that

24   Mr. Zaitsev is not a danger to the community.

25             And I'm happy to answer any other questions that

1    Your Honor might have.

2              THE COURT:  Okay.

3              Mr. Guzman, you wanted to add something?

4              MR. GUZMAN:  Yes.  Just on that last point.

5              So there -- this is in a report which I have.  I

6    haven't produced discovery yet.  I will not be the

7    prosecuting AUSA on this case but just to -- so that we all

8    are kind of operating on the same facts, the defendant was

9    called into an interview room.  The officers identified

10   themselves as ICE officers.  They told him that he was under

11   arrest.  They have a arrest -- we have an arrest warrant that

12   is signed that was issued several weeks before.  At that

13   point they got one handcuff on the defendant.  He began to

14   resist, and he screamed something in Russian along the lines

15   of "No arrest.  Lawyer.  Lawyer."  They then attempted to get

16   the second handcuff on, and at that point he did in fact

17   resist, and in both of their report they will talk about how

18   he was actively/passively resisting and it was a little

19   difficult to get that second handcuff on.

20             They ultimately got it on.  After about a minute

21   they walked him through the backdoor ICE offices, they walked

22   him into a hallway, and as soon as he entered that hallway,

23   about 10 feet down that hallway, he began to scream and their

24   -- in their reports they talk about how they ordered him to

25   continue to walk.  He continued to scream loudly in Russian.

1    He didn't just drop his weight and give up.  He flailed.  He

2    turned his head.  He continued to scream.  He kicked off the

3    walls.  In that context, one of the officers reached up and

4    tried to put his face forward because he kept turning his

5    head towards them, and it was at that point when the finger

6    was -- when the defendant bit his finger.

7            THE COURT:  Okay.  And you're saying that's all

8    reflected in a report that you have not yet produced to the

9    defense.  Is that the upshot?

10           MR. GUZMAN:  That's correct, Your Honor.  I have

11    not yet produced discovery.  We just indicted him on Friday.

12    The PIA is next week.  So -- I'm happy if Your Honor or the

13    defense counsel -- if you're inclined to release him, we can

14    postpone this hearing, we can proffer these pieces of

15    evidence, but sitting here today, those are -- even if you

16    take away my proffered facts, the Government still believes

17    that in this context where he assaulted a federal officer who

18    was lawfully walking him to processing that it's a clear

19    indication of danger not just to the community but to any law

20    enforcement officer that may need to go pick him up another

21    time.  Clearly, the defendant is emotional, and he bit almost

22    through an officer's finger, fracturing it and bloodying it.

23    That is a significant crime.  It is not just a one-off -- it

24    is not something that this Court or the Government should

25    just, you know, believe is just a one-off incident.  It is

1  concerning.

2          THE COURT:  Okay.  Thank you, Mr. Guzman.

3          Ms. Coit, you look like you wanted to say something

4  more?

5          MS. COIT:  To make clear for the record,

6  Your Honor, that defense has -- I sent a discovery letter to

7  Mr. Guzman -- I believe it was two days after this hearing --

8  requesting discovery on this case and was told I was not able

9  to receive any at this time after I requested it, and like I

10 said, I understand that it has now been indicted.  This is

11 the first that I'm hearing of these facts.  It sounds like

12 some of these may contradict what is in this sworn statement

13 and complaint, which is -- it -- when they're -- when the

14 incident happened versus when someone is grabbing his face,

15 and so I just put that out there.  And again, these are facts

16 in a report.  It's not a sworn statement.  I don't have the

17 ability to ask questions about these facts either, and so I

18 just want to make it clear for the record, Your Honor, that

19 this, again, is the first that I'm hearing of it --

20         THE COURT:  Right.

21         MS. COIT:  -- and based on --

22         THE COURT:  And you question the veracity --

23         MS. COIT:  Question the veracity, of course,

24 Your Honor, and I --

25         THE COURT:  -- given the omission of those items

1    from the complaint?

2         MS. COIT:  And again, it -- and it's -- even in the

3    worst-case scenario, even if all of this is true, we're

4    talking about a very isolated incident in an a very extreme

5    circumstance, and when you look at what is put in the

6    complaint -- again, that he was able to be arrested in this

7    case, and he has not had any issues since this time with the

8    marshals that we know about or at MDC.

9         Thank you.

10        THE COURT:  Okay.

11        MR. GUZMAN:  May I just say one last thing?

12        THE COURT:  All right.  My -- starting to -- we've

13   said enough probably.

14        Mr. Guzman, quickly?

15        MR. GUZMAN:  Happy to sit down.  I just want to

16   clarify one thing.  It's just a procedural thing.

17        Obviously, defense counsel hasn't had a chance to

18   see that report yet.  Defense counsel also proffered facts

19   that I have not been able to verify, to cross-examine,

20   including the defendant's history in Russia, any potential

21   criminal history in Russia.  So obviously these hearings tend

22   to have a little bit of proffering of facts that we don't

23   have the ability to cross-examine, and I'll just put -- with

24   that, I'll submit.

25        THE COURT:  Okay.  All right.

1          It's your motion, Ms. Coit, so I'm going to let you

2     have the last word, and it will be the last word unless

3     Pretrial tells me something new.  Go ahead.

4          MS. COIT:  Your Honor, my client wants -- is

5     indicating that he wants to speak with me.  Would the Court

6     mind if I just took a moment to --

7          THE COURT:  Go ahead.  Let me know when you're

8     ready.

9          (Counsel confers with defendant.)

10         MS. COIT:   Your Honor, I just want to end with

11    that the Government -- I've laid out what the -- multiple

12    times what the burden for the Government here is and, again,

13    detention -- part of trial is supposed to be the limited

14    exception.  There are many things that have to go into

15    consideration to reach that point, and I do not think that

16    that has been reached here.

17         Thank you.

18         THE COURT:  Okay.  Thank you, Ms. Coit, Mr. Guzman.

19         Pretrial, anything you wish to add?

20         MS. VAZQUEZ:  No, Your Honor.  Thank you.

21         THE COURT:  All right.  Any change in your

22    recommendation?

23         MS. VAZQUEZ:  No, Your Honor.  Thank you.

24         THE COURT:  Okay.  Thank you.

25         All right.  I'm going to come back to, really,

1   what's the difference between what I'm hearing today versus

2   what I heard at the original hearing?  The only new facts

3   that weigh in favor of Mr. Zaitsev that have been introduced

4   is that Mr. Galustian, who's here in court today, is willing

5   to serve as a surety for at least up to $10,000 and that

6   Mr. Galustian has verified some of the information about the

7   defendant's background but was unable to verify a lot of

8   other things about the defendant's background.  So that seems

9   to -- that's what I'm focusing on because I think I

10  considered pretty much everything, though, I think Government

11  gave some new facts, but again, those would weigh in favor of

12  the Government if I were to consider them.  So in terms of

13  facts that are in favor of the defendant, what I've

14  summarized, I think, is the only new circumstance.

15          And while I very much appreciate Mr. Galustian

16  coming to court today and willing to serve as a surety --

17  that definitely carries weight -- it does not escape the

18  Court's notice that he hasn't actually known the defendant

19  that long and is unable to verify a fair bit of the

20  information as well.  Again, that's not to undercut that he

21  obviously trusts the defendant enough to be willing to post

22  the bond, but I think about that in the overall decision.

23          So I don't think there has been a sufficient change

24  in circumstance for me to alter my prior detention ruling.

25  So I'm going to deny the motion for review, again, based on

1   flight and danger.  And, you know, again, bottom line,

2   however we parse the facts and however much we say he didn't

3   resist it early on or he did resist early on -- whatever the

4   competing facts are there -- the bottom line is there was

5   resistance at some point in the context of the incident, and

6   that carries weight for the Court and gives the Court concern

7   about, obviously, the danger issue.

8          And that goes to flight as well.  And as I think,

9   you know, everybody is probably aware the flight analysis is

10  not to say that he's going to flee to Russia.  I certainly

11  accept defense counsel's representations that he does not

12  want to go back to Russia, but that's not the only inquiry.

13  The inquiry is whether he will come to court here and appear

14  in court here at the Court's direction.  And so I do think

15  there are enough doubts that the Court has about that and

16  enough facts that suggest to the Court by a preponderance of

17  the evidence that no condition or combination of conditions

18  will reasonably assure his appearance as required.

19         And in terms of danger, I understand that the

20  evidence is among the least factors, but this is a resisting

21  arrest case and an assault case, and the facts described here

22  do persuade the Court that there is clear-and-convincing

23  evidence that no condition or combination of conditions will

24  reasonably assure the safety of any other person and the

25  community.

1          Let me ask the Government: You said the case was

2   indicted today.  Has a district judge been assigned yet?

3          MR. GUZMAN:  It was indicted on Friday.

4          THE COURT:  Oh, I'm sorry.  Friday.  Has a district

5   judge been assigned?

6          MR. GUZMAN:  Yes.  I believe it's Judge Garnett.

7          THE COURT:  Garnett.  Okay.

8          Then the defense obviously can appeal to District

9   Judge Garnett and see if she has a different view of things.

10         That's my ruling for today.  Anything else from

11  either side at this time?

12         Government?

13         MR. GUZMAN:  Not from the Government, Your Honor.

14         THE COURT:  Defense?

15         MS. COIT:  Not from the defense, Your Honor.

16         THE COURT:  All right.  Thank you all.

17         THE CLERK:  This court is adjourned.

18     (Proceedings adjourned at 3:50 p.m.)

19  ///

20  ///

21

22

23

24

25

1

2

3

4                                    CERTIFICATE

5              I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa_____        April 10, 2025_____
     Julie Messa, CET**D-403        Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25